Cornelia **HENSLEE** et al., Appellants,

v.

**STATE** of Texas and County of Dallas, Appellees.

No. 16341.

Court of Civil Appeals of Texas.

Dallas.

Dec. 20, 1963.

Rehearing Denied Feb. 21, 1964.

McKool & McKool, Dallas, for appellants.

Henry Wade, Dist. Atty., A. D. Jim Bowie, Ted Z. Robertson, Don R. Stodghill and Leonard E. Choate, Asst. Dist. Attys., Dallas, for appellees.

Gordon R. Wynne, Wills Point, Clyde Elliott, Jr., Canton, and Tobolowsky, Hartt, Schlinger & Blalock, Dallas, amici curiae.

BATEMAN, Justice.

In this condemnation case the award of the commissioners was $18,250, which, having been paid into court, was withdrawn by appellants pursuant to the provisions of Article 3268, Vernon's Ann.Tex.Civ.St., prior to the trial in the county court. In that trial the jury found the value of the condemned land to be $14,450. The judgment of the county court awarded to the condemnors, the State of Texas and County of Dallas, the land in question and judgment for $3,800, the excess of the commissioners' award over the verdict.

■ Appellees move to dismiss the appeal because the appellants "appropriated" $3,800 in excess of the county court's judgment, have therefore accepted the benefits of that judgment and are now estopped to prosecute an appeal therefrom. They rely on Latimer v. State, Tex.Civ.App., 328 S.W. 2d 242, err. ref. n. r. e., wherein, *after the trial in the county court* and the perfection of the appeal therefrom, the condemnor tendered to the landowners, and the landowners accepted, the amount of the judgment in the county court. The appeal was dismissed on the ground that the landowners could not claim that the judgment was right by accepting the benefits thereof and also that it was wrong by appealing therefrom. Here, however, the withdrawal was of the amount of the commissioners' award and was made *before the case was tried in the county court*. This was fully authorized by Article 3268, V.A.T.S., and the mere circumstance that the amount withdrawn exceeded the amount of the judgment would not estop the landowners from prosecuting their appeal. Thomas v. Housing Authority of City of Dallas, 153 Tex. 137, 264 S.W.2d 93. Appellees say alternatively that we should require a supersedeas bond as a condition precedent to the appeal, expressing great anxiety over the collectibility of their judgment for the $3,800, but we find no authority for such a requirement. Appellants had the option to suspend execution under the judgment. Rule 364, Vernon's Texas Rules of Civil Procedure. They chose not to do so.

■ Appellees also move to dismiss the appeal because the appeal bond is executed by only one of the three appellants as a principal. The two appellants who did not sign the appeal bond have not perfected their appeal and are hence appellants herein name only.

■ Appellees also move to dismiss the appeal because the appeal bond is payable only to the State of Texas and omits as an obligee the County of Dallas and also because it is in a penal sum of only $250,

whereas the costs shown by the transcript total $308.90. These defects are in our opinion informalities within the purview of Rule 404, Vernon's Texas R.C.P. and, not having been included in any motion filed in this court within thirty days after the filing of the transcript, are waived. Conlee v. Burton, Tex.Civ.App., 188 S.W.2d 713, 720, no wr. hist.; Pfeffer v. Meissner, Tex. Civ.App., 286 S.W.2d 241, 251, err. ref. n. r. e.

The motion to dismiss the appeal is overruled.

█ Appellees also urge us to strike from the record and not consider Exhibit "A" attached to appellants' brief. This exhibit is a certified copy of an ordinance of the City of Irving (in which city the subject property is situated) changing the zoning, not of the subject property, but of property across the street from it. This motion is sustained. The copy is not a part of the record of the trial of the case and may not therefore be considered by us. 3 Tex.Jur. 426, § 304, and cases cited therein; Rule 371, Vernon's Texas R.C.P.

On the merits of the appeal there is really only one main question to be determined by us, presented by appellants' first thirteen points of error on appeal, and that is whether the trial court erred in withdrawing from consideration by the jury the testimony of the expert witness Roy Eastus as to the market value of the subject property and four of the five comparable sales offered by Eastus in his testimony. We have concluded, under the facts of this particular case, that no such error was shown and that the judgment should be affirmed.

The testimony of this witness, whose qualifications as an expert on values are not questioned, may be summarized as follows: 56,616 square feet were condemned, of which 35,016 square feet fronting on Loop 12 were valued by him at $1 per square foot, or $35,016. This left 21,600 square feet fronting on Fleming Avenue, a short street north of and parallel to Loop 12,

which he valued at 25 cents per square foot or $5,400. Loop 12 is one of the best thoroughfares through Irving. In arriving at his appraisal he took into consideration the facts that the State Highway Department had made a traffic count of 10,830 in a twenty-four hour period in 1961, and the population growth of Irving, which was one of the fastest growing cities in Texas, growing at a rate of 4,500 to 5,000 per year. The zoning of this property was "A", residential. It was zoned "A" at the time the property came into the City of Irving and so far as he knows there has never been any application made to change the zoning. (It was stipulated at the trial that the zoning was not changed on the day of taking and that no application for a change had been made up to the time of trial nearly two years later.) In arriving at his evaluation he took into consideration five comparable sales within the area as follows:

1. Walter R. Harvy and wife to John R. Slaughter, Jr., October 3, 1958; 8,125 square feet located on Loop 12 about 300 feet south and on the opposite side of the street from the subject property; zoned "G" (meaning that it could be used for any type of local business); sold for $1 per square foot, or $8,125.

2. Estate of E. H. Mahan to Edward and Effie Cox, March 12, 1957; approximately 24,000 square feet located at Edgewood and Loop 12; no improvements; zoned "G", which permitted it to be used for any commercial use; sold for $26,000 or $1.10 per square foot.

3. Ralph S. Tennell and wife to James M. Parks, January 16, 1959; 11,500 square feet located at 319 Fleming Street, approximately 500 feet north of subject property; improved with a small 4-room frame house with closed in back porch and bath and garage, all in very poor condition. The property was zoned "A" for residential use. It sold for $7,000, of which the witness allocated $4,000 to improvements and $3,000 to land, making the land valued at approximately 26 cents a square foot.

4. G. C. Braddy and wife to Humble Oil & Refining Company, December 31, 1957; approximately 12,800 square feet at the northeast corner of 6th Street and Murphy Road, between five and seven blocks west of the subject property; no improvements; zoned "G"; sold for $17,500 or $1.37 per square foot.

5. Cleatus Hampton Rattan and Lena M. Rattan to Tremarko Corporation, September 12, 1956; 23,500 square feet at the southwest corner of Irving Boulevard and Murphy Road, situated five to seven blocks from the subject property; no improvements; zoned "H"; purchased for a filling station site for $47,000, or $2 per square foot. He said he considered a filling station site comparable to subject property, and a property zoned "H" comparable to a residential property.

The witness Eastus further testified: The owners could build on the subject property but under the present zoning could only build a residence. He is familiar with Ordinance No. 431, which is a "set-back resolution of the City of Irving", and with the fact that there was a 180-foot set-back from the center of the street, but that it was their property and it is still their property; they still pay taxes on it; they have an opportunity to go in there and apply for a building permit which he believes will be granted, which would mean that a building would have to set back about 93 feet from the edge of the subject property. His valuation of part of the property taken at $1 per square foot would make the property worth forty-three thousand, five hundred some odd dollars per acre, since there are 43,560 square feet in an acre. He does not think it important to bring to the jury sales of residential property on Loop 12 because he does not consider this property as such. He appraises property as of the day of taking and not some conjectural theory in the future, but "she could use her property." With respect to the Harvy to Slaughter sale in 1958, the property was zoned "G", commercial, and he doesn't think it has that 180-foot set-back; he thinks that set-back has already been put to use, and he understands the property was repossessed by the bank. The Mahan to Cox sale was of property zoned "G", which is commercial zoning, was an odd-shaped lot fronting on three streets. Tremarko Corporation was a purchasing agent for Gulf Refinery. If oil companies want corners for service station sites they will usually pay a little more to get them, but such sales are comparable in many ways. The property sold by Braddy to Humble is across the street from a junior high school, an apartment and a proposed shopping center site. He based his $1 per square foot on these sales, "as part of my make-up." In talking to a willing buyer, if he is a smart buyer, they would talk about the potential of this property, which is great, and he would buy it on that account, knowing he could get the benefit. He does not know of a single sale of residential zoned property in that block that has sold for $1 a square foot, or 75 cents a square foot or 50 cents a square foot. He doesn't think there is any sale in there to amount to anything; if there were, there were very few. It is a technique, but not the best technique, to base market value on sales in the neighborhood in valuing residential property like that. Some of the best sales they make "is residential and they sell for other purposes at that time and they buy them with the intention of getting it zoned." When asked if his testimony was based, not on sales in the neighborhood, residential, but on conjecture of what might happen in the future, he said: "I don't care what it is zoned at. I still say that property on that point will bring $1 per square foot or more." There has been no change in the zoning up to the day of taking in this area, or application made therefor, and there won't be "until this is over, I don't think." He said he was fairly familiar with the facts of the zoning in Irving, which is one of the factors he took into consideration in reaching his opinion of the market value of Mrs. Henslee's property. *The adaptability and business use of Mrs. Henslee's prop-*

*erty is the basis of his opinion in placing the market value on her property,* and the highest and best use of her property was the basis for the market value that he placed upon her property. It is necessary for an appraiser to take into consideration the adaptability and highest and best use of the property, which he did in making his appraisal. In his opinion it is important in valuing property to know what use the property is adaptable to. (Italics ours.)

In the course of this witness' testimony the appellants' attorney moved the court to allow appellants to question Eastus further in regard to the highest and best use of the subject property and in regard to how such expert witness arrived at his appraisal value *and to show the reliance placed upon the adaptability of the property to future business use in arriving at his appraisal.* (Italics ours.)

Counsel for appellees moved several times during the trial that Eastus' testimony and the comparable sales mentioned by him in which the property was zoned "commercial" be stricken and the jury instructed not to consider the same. These motions were overruled, but in no instance was this done without qualification. For instance, on one occasion the judge stated: "At this time I will overrule the motion. I will take it under consideration at a later time if I believe it necessary to consider it." It could not therefore have been a surprise to counsel for appellants when, at the close of the testimony, the court excused the jury and in chambers announced to the attorneys that he was now sustaining the appellees' motion to strike Mr. Eastus' testimony as to the value of the land taken and all of the comparable sales mentioned by him except sale No. 3. The record shows that while counsel for appellants argued with the court on the propriety of the ruling and urged the court to reverse it, he did not request leave to withdraw his announcement of closing, or additional time in which to produce other testimony or evidence. The court then instructed the bailiff to erase from the blackboard the figures under the name of

Roy Eastus as to the value of the land and the comparable sales, to all of which counsel for appellants took exception but still did not request additional time to produce other evidence. The court then called the jury back into the jury box and delivered the charge to them.

There was no evidence of a probable change in the zoning regulations within a reasonable time.

Appellants have called our attention to our opinion in Andrews v. City of Dallas, Tex.Civ.App., 232 S.W.2d 753, 755, wherein we said rather broadly that in an eminent domain proceeding the measure of damages is "the highest value of the property for any use for which the property is adaptable," and also that where the property being condemned is zoned for residence use, "it is error to exclude evidence of market value for residence purposes; it is also error to exclude its market value for any other purpose for which it is adaptable; and it matters not that the land may be presently unavailable under the zoning ordinance for all of such purposes." We do not consider that language as controlling here. In the first place, it is pure *dictum* because the only question actually involved in that case concerned the propriety of a jury argument. But more important is the fact that our Supreme Court in City of Austin v. Cannizzo, 153 Tex. 324, 267 S.W.2d 808, expressly held that neither our opinion in the Andrews case nor its opinion reversing the case in City of Dallas v. Andrews, 149 Tex. 609, 236 S.W.2d 609, conclusively upheld the position that the jury should be allowed to consider the value of the property for commercial purposes in the face of contrary zoning restrictions.

◼ In City of Austin v. Cannizzo, *supra,* the Supreme Court, after expressing its unwillingness to lay down a hard and fast rule that in arriving at market value consideration may never be given to a use for which property is reasonably suitable and adaptable but which use is presently prohibited by a zoning ordinance, it being

a matter of common knowledge that such ordinances are frequently lifted and the zoning changed, and also its unwillingness to announce a rule, except in general terms, that should be applied in all cases where zoning ordinances or other legal restrictions existing at the time of taking prohibit the use of the property for purposes other than those to which it is devoted, laid down this general rule:

"If the trial judge is satisfied from the evidence as a whole that there is no reasonable probability that existing restrictions may be lifted within a reasonable time, he should exclude evidence of value based on use for any purposes other than those to which it is restricted. On the other hand, if it appears reasonably probable to the trial judge that the wants and needs of the particular community may result, within a reasonable time, in the lifting of restrictions, he should admit testimony of present value based on prospective use of the property for purposes not then available."

By this language the trial court is given considerable discretion as to whether he will permit evidence of the adaptability or suitability of the condemned property for commercial or business uses when at the time of taking the zoning regulations prohibit such use. We are not authorized to substitute our rulings for his on the admissibility of evidence unless it appears that he has abused that discretion.

It was said in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, 200:

"It appears to us that in most if not all cases the whole matter of what may be considered by the jury and what may not be considered will be best determined by the trial court in the admission and exclusion of testimony rather than by instructions to the jury. In that way the possibility of instructions upon the weight of the evidence,

and also the possibility of the jury allowing damages upon the basis of special items, rather than determining the ultimate question of the difference in market value, will be avoided."

██ The ruling complained of was consistent with both of the Supreme Court's opinions above discussed, and we cannot say in the light of the record of this case that the trial judge erred in excluding the testimony. · State v. Baker Bros. Nursery, Tex.Sup., 366 S.W.2d 212; Cravens v. City of Amarillo, Tex.Civ.App., 309 S.W.2d 903, 908, err. dism. The first thirteen points of error are overruled.

In their fourteenth point of error appellants set forth seven separate rulings and remarks of the trial judge, all of which were unfavorable to appellants, and say that the cumulative effect thereof was to deny appellants a fair and impartial trial. They did not, in our opinion, cause the rendition of an improper judgment. Rule 434, T.R.C.P. The jury found the highest value testified to by any witness whose testimony was allowed to remain before the jury, which in itself belies the thought of an unfair trial. The point is overruled.

██ In their fifteenth and sixteenth points appellants say that the verdict and judgment are wholly inadequate and insufficient, the only argument being that the verdict and judgment are $3,800 less than the award of the special commissioners. This is insufficient. The points are overruled.

In their seventeenth and last point appellants remind us that it has been held that when one particular error is itself insufficient to require a reversal, the cumulative effect of numerous errors may be sufficient for that purpose. Our search of the entire record fails to reveal any error which by itself or in conjunction with others would justify a reversal.

Affirmed.