Marvin A. BROWN, d/b/a Brown Service Company, Appellant,

v.

Joe B. OWEN et al., Appellees.

No. 16977.

Court of Civil Appeals of Texas.

Fort Worth.

Dec. 27, 1968.

Rehearing Denied Jan. 24, 1969.

Stone, Tilley, Parker, Snakard, Law & Brown, and James B. Barlow, Fort Worth, for appellant.

Shannon, Gracey, Wright, Ratliff & Miller, and Robert D. Wilkes, Fort Worth, for appellee Morris B. Parker.

Pepper & Markward, and R. C. Pepper, Fort Worth, for appellee Joe B. Owen.

OPINION

MASSEY, Chief Justice.

On the Motion to Dismiss

In connection with this appeal by a defendant from a judgment for plaintiffs for damages at common law, the victorious plaintiffs have filed a motion attacking the costs and supersedeas bond filed and approved by the clerk of the trial court in the amount of $6,382.00. The bond is not attacked on the premise of its insufficiency as to amount, but upon the theory that it is not the kind or character of bond designed to supply or sufficient to support the appeal because it is not signed by the defendant, either in person or by agent or attorney, and the result is a want of appellate jurisdiction.

The language of the bond follows that of ordinary usage and custom relative to number and style of the cause in the trial court, describes the judgment from which the appeal is desired to be taken, and names the party in whose favor the judgment of the trial court was rendered, and names the party against whom it was rendered. Defendant Marvin A. Brown was the party against whom the judgment was rendered. In the language of the bond it was stated that the said defendant, Marvin A. Brown, desired to appeal and also to suspend execution of the judgment. Thereafter the language of the bond read: "NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS, that we, AMERICAN MOTORISTS INSURANCE COMPANY, as principal, and LUMBERMENS MUTUAL CASUALTY COMPANY, as surety, acknowledge ourselves bound to pay to * * * CONDITIONED THAT the said Marvin A. Brown shall prosecute his appeal with effect, pay all costs * * * and in case judgment of the Supreme Court or Court of Civil Appeals shall be against him, he shall perform its judgment, sentence, or decree, and pay all damages as said court may award against him." The bond was executed by the Lumbermens Mutual Casualty Company as surety, and by American Motorists Insurance Company as principal. Nowhere on the bond was there any execution by the defendant Brown or by anyone whose capacity to sign for him was expressed.

Despite the attack made by the motion to dismiss, the defendant never at any time prior to submission, nor on the day of submission, tendered an amended bond by way of a supplemental transcript. In his reply to the motion to dismiss the defendant included what he called an "Alternate Motion for Leave to Substitute Amended Bond". He pointed out the fact that Texas Rules of Civil Procedure, rule 430, "Amendment: New Appeal Bond", authorizes "the amendment of any sort of instrument which can be said to be a bond and which was filed for the purpose of taking an appeal." United Ass'n of Journeymen, etc. v. Borden, 160 Tex. 203, 328 S.W.2d 739 (Tex.Sup., 1959). The effect of what the defendant said was that if and in the event this court should decide as insufficient the bond in the transcript he moved for leave to substitute as the bond in the case one which he proposed to tender, such other to be in a form where the name of Marvin A. Brown would be added as a principal obligor on the bond on file with the clerk of the trial court or on a bond which would be identical thereto except for a change which would add Brown as a principal obligor.

We determine the question by holding as a matter of law that the bond in the transcript is sufficient to support the appeal. We make the determination by bearing in mind the object and purpose and obligations undertaken in affording security to the obligees named by such a bond, and the state of the law as declared in situations of similarity. We do not reach the question of whether the "respondent" in relation to the matter of the motion to dismiss the appeal could be allowed to amend the bond under the proposed procedure.

It follows from United Ass'n of Journeymen, Etc. v. Borden, supra, that jurisdiction of the appeal was conferred on this court. In other words there would be no question of the efficacy of the bond to confer jurisdiction, whether or not we might conclude that it would be proper to declare it insufficient to support the continued entertainment of the appeal.

▮ The purpose of the bond as applied to a court clerk charged with responsibility as to costs is to secure the trial court and the appellate courts in relation to costs,—and, in the event of a supersedeas and as to supply compensation for delay of the enforcement of a decreed judicial remedy, to secure the party who has prevailed and obtained a judgment in the trial court pending a final determination of the appeal. The concern of such parties, i.e., the clerk and he who has obtained a judgment, is that they be actually adequately protected; that they will be assured of costs and decreed remedies, if the judgment is upheld by the appellate courts. The general rule is that even as applied to a supersedeas bond which is invalid as such the sureties are liable thereon when the bond accomplishes the purpose for which it was intended by procuring for the principal obligor a stay of execution. Lloyds Casualty Insurer v. Farrar, 141 Tex. 497, 174 S.W. 2d 302 (1943).

▮ In Purcell v. Metropolitan Cas. Ins. Co. of New York, Tex.Civ.App., 260 S.W. 2d 134 (Fort Worth Civ.App., 1953, no writ hist.) this court became committed to the holding that an appeal bond supports the appeal even when the signature of the appellant is not that of a competent principal if it has been executed by competent sureties; and that such bond is necessarily to be considered as filed either by or for the appellant as principal. In such case the appellant was a minor who had signed the bond. In the instant case, by affidavits which are not attacked as insufficient to accomplish their intended purpose, the defendant Brown has shown (or it is shown for him) that American Motorists Insurance Company, under and by virtue of and because of a contract of insurance with Brown, would be the ultimate obligor as applied to responsibility and duty to pay the judgment rendered by the trial court. Any insufficiency of security because Brown did not execute the bond himself, in person, is not a premise for the attack made. Hence we are not concerned with

any need to require Brown bind himself as an obligor in order to afford adequate security. It is to be presumed, under the circumstances, that there is no such need.

The plaintiffs have pointed out two cases by the Dallas Court of Appeals where non-signatory appellants had appeals *dismissed as to them* because their signatures did not appear on appeal bonds, or were treated as "appellants in name only" for that reason. See Henslee v. State, 375 S. W.2d 474 (Dallas Civ.App., 1963, ref. n.r. e.) and Kittrell v. State, 382 S.W.2d 273 (Dallas Civ.App., 1964, ref. n.r.e.). We believe the material distinguishing characteristic of these from the instant case is that here there was only a single person who could have perfected the appeal to which the bond related, while there were more than one in each of the Dallas cases. Even after the subject parties were treated as having abandoned or forfeited their right to appeal there remained in those cases a party who could be treated as a proper appellant.

The motion to dismiss the appeal is overruled.

### On the Merits

■ The defective condition of an instrumentality which operates to cause an accident, created at a prior time by one person when he was "in exclusive control" thereof (of the factors around which the creation was probably centered) persisting at and after such "exclusive control" passes into the hands of another—is not the negligence of such other, but would continue to be negligence amounting to proximate cause of the accident on the part of him who first had "exclusive control". The person subsequently in control may be or become independently negligent in failing to discover and correct such defective condition, in which event his negligence might likewise become a proximate cause of the same accident. Where evidence raises issues relating to negligence of the person subsequently having "exclusive con-

trol", necessarily involving the question of whether there was a negligent failure to discover and correct the defective condition at or after the time he was placed "in exclusive control", they are not to be resolved through special issues submitted and answers returned under the doctrine of res ipsa loquitur.

■ Such was the situation of the existent case. Plaintiffs' judgment against the defendant was based upon answers to special issues submitted on the theory that the doctrine had application. The judgment must be reversed.

August 4, 1965 plaintiff Joe B. Owen purchased a building in which plaintiff Morris B. Parker had offices as a tenant. As part of the air conditioning equipment in the building there was a 5-Ton "Carrier" refrigeration unit—proximate to the premises rented by Parker but not in the part of the building he held under lease. Because he was having difficulty with the air conditioning units in the building, and felt that they were not being properly serviced, Owen discontinued the services of the air conditioning service company which the former owner of the building had used, and before the end of August arranged for such services by the defendant, Marvin A. Brown, d/b/a Brown Service Company. No service contract was effected, though arrangement was made between Owen and the defendant that whenever he had occasion to require service work defendant's employee, Dean Hughes, would perform such. As applied to the "Carrier" refrigeration unit and all others in or attached to the building Mr. Owen considered that the defendant, by and through his employee Dean Hughes, was from that time "in exclusive control".

From this point in the opinion we will treat only with the "Carrier" 5-Ton unit. This unit was of the type which utilizes water cooling. There was a tower on the roof of the building through which water was circulated to be cooled, therefrom circulating by the means of pipes down into

and through the unit, then passing therefrom by the means of other pipes back up to the cooling tower. Compensating in part for the vibration of the machine when in use and to minimize the effect upon the attachments outside same, etc., some of the water pipes had rubber hose attachments bridging from one to another. The attachment with which we are concerned was a hose approximately 8″ to 12″ in length, located at the side of the unit (as the door to the unit is opened for ordinary inspection, adjustment, etc.) about 8″ to 10″ above the floor and about 20″ from the unit itself. Function of the pipes—connected (or supposed to be) by the water hose—as to carry water from the unit up to the cooling tower on the roof. On or about July 30, 1966, within a few hours after a time when Dean Hughes had been servicing the unit (though, according to his testimony, at a point removed from the hose in question and wholly unrelated thereto) it was discovered that the building had become flooded. There was no question but that the flooding resulted in substantial damage to the property of both plaintiffs. A search for the source of the water causing such flooding revealed that the aforementioned hose had become completely detached from one of the pipes to which it should have been securely fastened, thus allowing the escape of water.

Investigation revealed that the hose was securely fastened to one of the metal pipes, but that it had not been securely fastened to the other, hence the separation of the hose from the pipe and resulting escape of water. It was indisputably established by the evidence that there was nothing wrong with the hose and with the pipe to which it should have been connected. Also established was the fact that the clamp which should have been securely tightened down on the hose—anchoring it to and around the metal pipe—was not secure. Though the testimony was that there was a groove or indentation on the hose, indicative that the clamp had at one time been secure, it also established that the bolt or screw by which the clamp could be adjusted was very loose. The defective condition was remedied by placing the hose back on the metal pipe and tightening the clamp with a screw-driver.

The testimony of the defendant was to the effect that a service man does not tighten a connection of the kind in question unless there is evidence of a leak by a seepage therefrom; that if you tightened such a connection "every time you went in" you would eventually cut the hose in two. Testimony of defendant's employee, Hughes, was to the same effect, and that he had never at any time tightened the clamp in question; that there was no seepage evident therefrom at time of any inspection or check and never any occasion, incident to normal and customary servicing activities, to investigate the tension of the clamp. His testimony was that the condition of the hose and clamps, as of the first time he serviced the unit, had never been physically altered by him at any time during the period when he serviced the unit and had not been checked other than by visual examination to determine whether there was water seepage.

The special issue submitted read: "Do you find from a preponderance of the evidence that defendant's employee Dean Hughes failed to exercise that degree of care which an ordinarily prudent workman in the performance of his services in the exercise of ordinary care would have exercised under the same or similar circumstances in servicing the air conditioner unit in question prior to leaving the Bailey Building on July 30, 1966?" It would seem that the inquiry of the issue assumes the period of "exclusive control" of the factors around which negligence was probably centered as upon or immediately around the date mentioned in the special issue, though all the evidence was to the effect that the part of the unit in question to which Hughes had directed all activities at such time was some distance removed from the hose and clamp in question. But our view of the

factors compelling our decision obviates any discussion thereupon.

It is our opinion, from the record, that it would not be a matter of dispute but that assignable negligence on the part of someone, in support of a prima facie case for plaintiffs, lay either in (a) failure to secure the clamp to the hose and the hose to the pipe prior to the occasion when defendant and his employee first had anything to do with the servicing of the unit (and its connections, etc.); (b) (assuming such was not properly secured when defendant first had contact with the unit) a failure of the defendant at that time or upon subsequent occasions, terminating with the servicing activities on July 30, 1966, to discover and correct the insecurity of the connection; (c) a loosening of (and causing to become insecure) the connection by defendant pursuant to his servicing activities; and/or (d) (assuming the condition of security through act of the defendant in loosening the same) a failure to re-tighten and make the connection secure.

In making the foregoing statement we have assumed that there was evidence which positively established that from the time the defendant first had access to the unit no other person had any measure or degree of control of the factors around which the negligence, i.e., in connection with the loosening or failure to tighten, was probably centered. (In the instant case the jury found against any existence of unavoidable accident. Therefore we may disregard the possibilities of relaxation of tension on the clamp through deterioration or as the result of natural causes such as vibration, etc.)

The evidence shows that the accident, i. e., separation of or breakdown in the connection with accompanying discharge of water, may have happened as the result of one or two or more causes, and it is not more reasonably probable that it was due to the negligence of the defendant and his servant than to any other cause, as, for example, the negligence of the servicing company who tended the maintenance before defendant's services were engaged. In such a case the doctrine of res ipsa loquitur does not apply. We therefore hold that the trial and submission of the case to the jury on the theory of its applicability, and the founding of judgment upon the findings of the jury in response thereto, constituted a trial, verdict and judgment upon the wrong theory, requiring a reversal and remand. Brigman v. Holt & Bowers, 32 S.W.2d 220 (Amarillo Civ.App., 1930, error refused); Texas & P. Coal Co. v. Kowsikowsiki, 103 Tex. 173, 125 S.W. 3 (1910); Hodges Tire Company v. Kemp, 334 S.W.2d 627 (Fort Worth Civ.App., 1950, no writ hist.); 40 Tex.Jur.2d p. 675, "Negligence", Sec. 148, "—Requisites for application (of the doctrine of Res Ipsa Loquitur)". Also see generally Houston, E. & W. T. Ry. Co. v. Roach, 52 Tex.Civ. App. 95, 114 S.W. 418 (Galveston Civ.App., 1908, error refused) and the law review articles at 26 Tex.L.Rev., pp. 257 and 761, "Res Ipsa Loquitur in Texas" by Starling Thomas Morris; and "Notes" at 36 Tex. L.Rev., p. 696, regarding special issues in such cases.

Reversed and remanded.