Carlisle v. Philip Morris, Inc. 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN





 





NO. 3-89-175-CV





WELDON J. CARLISLE, ET AL.,




 APPELLANTS


vs.





PHILIP MORRIS, INC., ET AL.,



 APPELLEES



 




FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT



NO. 387,233, HONORABLE PETE LOWRY, JUDGE PRESIDING



 




 This appeal presents the question of whether the Federal
Cigarette Labeling and Advertising Act, 15 U.S.C. §§ 1331-1341
(1982 & Supp. 1990) ("Labeling Act"), preempts state common-law
tort claims for injuries or death allegedly suffered as a result of
smoking cigarettes. Plaintiffs below were two individuals alleging
injuries and two widows alleging wrongful death. (1) Defendants
below were various cigarette manufacturers, wholesalers, and
related entities. (2) In four separate suits, plaintiffs alleged 

five causes of action: (1) failure to warn; (2) design defects;
(3) manufacturing defects; (4) affirmative misrepresentation; and
(5) civil conspiracy. After consolidating the four cases, the
trial court granted the defendants' motions for summary judgment on
the ground that the Labeling Act preempted all of the plaintiffs'
claims. Plaintiffs perfected this appeal. We will reverse the
trial court's judgment and remand the cause.



PLAINTIFFS' CLAIMS


 Plaintiff Carlisle smoked for over sixty-five years. He
now suffers from laryngeal cancer, which he alleges was caused by
prolonged cigarette smoking. Plaintiff Woods, a cigarette smoker
for fifty-three years, suffers from lung cancer, which he alleges
was caused by prolonged smoking. The deceased spouses of
plaintiffs Rothgeb and Dyer smoked cigarettes for forty-four and
thirty-eight years, respectively; both died from lung cancer, which
those plaintiffs also allege was caused by prolonged cigarette
smoking.

 Plaintiffs each alleged the same five theories of
recovery. First, under the doctrine of strict liability, they
alleged a defective design cause of action for marketing "a
defectively designed product; a product which was unreasonably
dangerous as designed, taking into consideration the utility of the
product and the risk involved in its use." Second, also under the
strict liability doctrine, plaintiffs alleged a manufacturing
defect cause of action for marketing "a defective and unreasonably
dangerous product; a product that is dangerous to an extent beyond
that which would be contemplated by the ordinary user of the
product with the ordinary knowledge common to the community as to
the product's characteristics." Third, under both strict liability
and negligence, plaintiffs alleged a failure-to-warn cause of
action for failing "to give adequate warnings of the danger or
adequate instruction for safe use" of cigarettes. Fourth, based on
the RESTATEMENT (SECOND) OF TORTS § 402B, plaintiffs alleged a
misrepresentation cause of action for "affirmatively
misrepresenting to the public that cigarette smoking did not
involve significant health hazards." Fifth, plaintiffs alleged a
cause of action for civil conspiracy, alleging that defendants had
engaged in "both negligent and grossly negligent conduct in concert
. . . in an effort to nullify the overwhelming medical evidence
that cigarette smoking is addictive and causes lung cancer and
death."

 Plaintiffs did not contend that defendants violated any
provision of the Labeling Act itself.

 Defendants filed motions for summary judgment, arguing
(1) that the Labeling Act preempted all of plaintiffs' claims, and
(2) that plaintiffs' claims were not viable as a matter of
substantive law. The trial court granted summary judgment for
defendants solely on preemption grounds.


MOTION TO STRIKE


 Before discussing the merits of the plaintiffs' single
point of error, we address defendants' motion to strike a portion
of plaintiffs' brief. Under the subheading "An Overview of the
Problem," the statement-of-facts section of plaintiffs' brief
contains a lengthy dissertation on the dangers of smoking and the
evils of the tobacco industry. Citing and quoting from a host of
scientific and medical books, pamphlets, and journals -- none of
which is in the record -- plaintiffs' brief sets forth twelve pages
of "facts" interspersed with disparaging comments about the
defendants. It is this portion of plaintiffs' brief that
defendants ask this Court to strike.

 It is elementary that, with limited exceptions not
material here, an appellate court may not consider matters outside
the appellate record. Sabine Offshore Service, Inc. v. City of
Port Arthur, 595 S.W.2d 840 (Tex. 1979); Perry v. Kroger Stores,
Store No. 119, 741 S.W.2d 533 (Tex. App. 1987, no writ). That
record consists of the transcript and, where necessary, a statement
of facts. Tex. R. App. P. 50(a). Material outside the record that
is improperly included in or attached to a party's brief may be
stricken. Henslee v. State, 375 S.W.2d 474 (Tex. Civ. App. 1963,
writ ref'd n.r.e.); Humble Oil & Refining Co. v. State, 158 S.W.2d
336, 338 (Tex. Civ. App. 1942, writ ref'd). 

 Scientific and medical publications such as those
referred to in plaintiffs' brief are outside the record unless they
have been properly submitted to the trial court and included as
part of the evidence. Indeed, in the trial court, statements from
"learned treatises" are admissible only in conjunction with
testimony by an expert witness, "even when the authority of the
publication is otherwise established." Goode, Wellborn, & Sharlot,
Guide to the Texas Rules of Evidence: Civil and Criminal 596
(1988); see Tex. R. Civ. Evid. 803(18).

 Accordingly, we grant defendants' motion to strike. 
Given the present posture of this appeal, we will not require
plaintiffs to rebrief (3); however, in making our decision, we have
not considered the offending portion of their brief.

 For their part, defendants here have been guilty of a
similar transgression. Attached as appendices to their briefs are
copies of numerous orders, judgments, and other materials from a
variety of state and federal trial courts purporting to reflect
decisions upholding federal preemption in cigarette cases. As far
as we can tell, these decisions are neither published nor scheduled
for publication. They do not appear in the transcript as part of
the summary judgment evidence. To the extent defendants intend for
such rulings to be legal precedent, the Texas Rules of Appellate
Procedure expressly prohibit the citation of unpublished opinions. 
Tex. R. App. P. 90(i). To the extent they are cited merely to show
the existence of such decisions, they constitute facts outside the
record. In either event, those portions of defendants' briefs are
stricken sua sponte.


THE LABELING ACT


 In 1964 the Surgeon General of the United States issued
a widely publicized report implicating cigarette smoking as a cause
of lung cancer and other diseases. In 1965 Congress responded to
that report and the growing awareness of the health hazard posed by
cigarettes by passing the Labeling Act. The most salient feature
of the Act was a requirement that warning labels be placed on all
cigarette packages and advertisements. (4)

 Substantially amended in 1970 and again by the
Comprehensive Smoking Education Act of 1984, the Labeling Act
contains a declaration of policy, which states that:


 It is the policy of the Congress, and the
purpose of this chapter, to establish a comprehensive
Federal program to deal with cigarette labeling and
advertising with respect to any relationship between
smoking and health, whereby--


 (1) the public may be adequately
informed about any adverse health effects of
cigarette smoking by inclusion of warning
notices on each package of cigarettes and in
each advertisement of cigarettes; and


 (2) commerce and the national
economy may be (A) protected to the maximum
extent consistent with this declared policy
and (B) not impeded by diverse, nonuniform,
and confusing cigarette labeling and
advertising regulations with respect to any
relationship between smoking and health.


15 U.S.C. § 1331.

 The Act also contains a preemption provision, which reads
as follows:


(a) No statement relating to smoking and health, other
than the statement required by section 1333 of this
title, shall be required on any cigarette package.


(b) No requirement or prohibition based on smoking and
health shall be imposed under State law with respect to
the advertising or promotion of any cigarettes the
packages of which are labeled in conformity with the
provisions of this chapter.


15 U.S.C. § 1334. Other significant sections of the Labeling Act
prohibit cigarette advertising on radio and television (§ 1335),
require manufacturers to provide annually a list of ingredients
added to tobacco in the manufacturing process (§ 1335a), require
the Secretary of Health and Human Services and the Federal Trade
Commission to report to Congress annually concerning various
cigarette-related issues (§ 1337), require the Secretary of Health
and Human Services to carry out a public information program about
the dangers of cigarette smoking (§ 1341), and provide for criminal
penalties for violations of the Act (§ 1338).


PRIOR COURT DECISIONS


 Ten reported appellate court opinions, five federal and
five state, have previously addressed the preemptive effect of the
Labeling Act on common-law tort claims for injury from smoking
cigarettes. We will briefly summarize the history and holdings of
each of those cases, in chronological order.

 1. Cipollone v. Liggett Group, Inc., 789 F.2d 181 (3rd
Cir. 1986) (Cipollone I), rev'g 593 F.Supp. 1146 (D.N.J. 1984),
cert. denied, 479 U.S. 1043 (1987), on remand, 649 F.Supp. 664
(D.N.J. 1986), and 683 F.Supp. 1487 (D.N.J. 1988), aff'd in part,
893 F.2d 541 (3rd Cir. 1990) (Cipollone II).


 In Cipollone, the plaintiff sued under strict liability,
negligence, intentional tort, and breach of warranty. In a lengthy
opinion, the district court denied the defendants' motion for
judgment on the pleadings, holding that none of the plaintiffs'
claims were preempted by the Labeling Act. 593 F.Supp. 1146. The
Court of Appeals for the Third Circuit reversed, concluding that,
although the Act neither expressly preempted such claims nor
"occupied the field" relating to cigarettes and health, nonetheless
such claims "actually conflicted" with the purposes and objectives
of the Act. The court held that the Act preempts "those state law
damage actions relating to smoking and health that challenge either
the adequacy of the warning on cigarette packages or the propriety
of a party's actions with respect to the advertising and promotion
of cigarettes." 789 F.2d at 187. The appellate court remanded the
cause to the district court for determination of which claims were
preempted by the Act. On remand, the district court concluded that
the plaintiffs' failure-to-warn, fraudulent-misrepresentation,
express-warranty, and conspiracy-to-defraud claims were preempted
to the extent they sought to challenge the defendants' advertising,
promotional, and public relations activities. 649 F.Supp. at 668-75. On further appeal after trial, the court of appeals affirmed
the district court's preemption ruling, although other aspects of
the district court's judgment were reversed and the cause remanded
for new trial. 893 F.2d at 581-83.

 2. Stephen v. American Brands, Inc., 825 F.2d 312 (11th
Cir. 1987).


 In Stephen, the widow of a deceased smoker sued, at least
in part, on a failure-to-warn theory. The defendant answered that
some of the plaintiff's claims were preempted by the Labeling Act. 
The plaintiff moved to strike that defense. The district court
denied the motion, relying on Cipollone I. On appeal, the Court of
Appeals for the Eleventh Circuit affirmed without significant
discussion, adopting the "decision and reasoning" of the Third
Circuit in Cipollone I.

 3. Palmer v. Liggett Group, Inc., 825 F.2d 620 (1st Cir.
1987), rev'g 633 F.Supp. 1171 (D.Mass. 1986).


 In Palmer, the widow of a smoker sued primarily under a
failure-to-warn theory, although the complaint also included
allegations of "negligence in not making cigarettes safer" as well
as breach of implied warranties of merchantability and fitness. 
The defendants filed a motion to dismiss all claims based on
failure to warn. The district court denied the motion. The court
expressly disagreed with the Third Circuit's opinion in Cipollone
I, choosing instead to follow the opinion of Judge Sarokin, the
Cipollone trial judge. 633 F.Supp. at 1173. On appeal, the Court
of Appeals for the First Circuit reversed on "actual conflict"
grounds, holding that permitting such common-law failure-to-warn
claims would "disrupt[] excessively" the "carefully wrought balance
of national interests" struck by Congress in passing the Labeling
Act. 825 F.2d at 626.

 4. Phillips v. R.J. Reynolds Industries, Inc., 769
S.W.2d 488 (Tenn. Ct. App. 1988).


 In Phillips, it appears that a smoker who contracted
Buerger's disease sued solely on a theory of failure to warn. The
trial court granted summary judgment for the cigarette companies on
the basis of preemption. Relying primarily on Palmer, the
Tennessee Court of Appeals affirmed. 769 S.W.2d at 490.

 5. Roysdon v. R.J. Reynolds Tobacco Co., 849 F.2d 230
(6th Cir. 1988), aff'g 623 F.Supp. 1189 (D.C. Tenn. 1985).


 In Roysdon, a long-time smoker sued on two grounds: that
cigarettes are "defective and unreasonably dangerous" and that the
warnings on cigarette packages and in cigarette advertising are
inadequate. The district court granted the defendant's motion to
dismiss that portion of the complaint resting on inadequate
warnings, on the basis that such claims were preempted by the
Labeling Act. 623 F.Supp. at 1190-91. The plaintiffs'
"unreasonably dangerous" claim was tried to a jury, following which
the court directed a verdict for defendant on substantive-law
grounds. 623 F.Supp. at 1191-92. The Court of Appeals for the
Sixth Circuit affirmed, relying on Cipollone I and Palmer.

 6. Forster v. R.J. Reynolds Tobacco Co., 437 N.W.2d 655
(Minn. 1989), rev'g in part 423 N.W.2d 691 (Minn. Ct. App. 1988).


 In Forster, a smoker with inoperable lung cancer and his
wife brought suit in Minnesota state court under theories of strict
products liability, breach of warranty, and negligence. The trial
court, relying on Cipollone I, granted summary judgment for the
defendants on preemption grounds. The Minnesota court of appeals,
rejecting the Cipollone I appeals court decision and relying
instead on the Cipollone district court opinion, reversed the
summary judgment as to all causes of action. 423 N.W.2d at 692-93. 
On further appeal, the Minnesota Supreme Court affirmed in part and
reversed in part. The court held that "any state claim that
questions the adequacy of cigarette advertising or promotion with
respect to smoking and health, or which questions the effect of
that advertising or promotion on the federal label, is preempted."
437 N.W.2d at 660. On the other hand, the court held that claims
not based on a failure to warn (such as strict liability based on
a risk-utility theory, affirmative misrepresentation, and breach of
warranty) do not conflict with the objectives of the Labeling Act
and are therefore not preempted. Id. at 661-62.

 7. Pennington v. Vistron Corp., 876 F.2d 414 (5th Cir.
1989).


 In Pennington, the widow of a smoker who had died of
cancer of the esophagus sued various cigarette manufacturers,
claiming that the companies had failed to provide adequate warnings
and that cigarettes are unreasonably dangerous per se. The
district court granted summary judgment for the manufacturers on
all counts. On appeal, the court of appeals held that the failure-to-warn claim was preempted by the Labeling Act, but that the other
claim was not. 876 F.2d at 420-23.

 8. Hite v. R.J. Reynolds Tobacco Co., 578 A.2d 417 (Pa.
Super. Ct. 1990).


 In Hite, the widow of a deceased smoker sued under
theories of defective design and failure to warn. On the basis of
preemption, the trial court dismissed both grounds as to a
manufacturer against which there were no pre-1965 allegations. On
appeal, the Pennsylvania Superior Court held that the failure-to-warn claim was preempted, but that the defective-design claim was
not. 578 A.2d at 420. Nonetheless, the appeals court affirmed the
dismissal of the defective-design claim on substantive law grounds. 
Id. at 420-21. 

 9. Dewey v. R.J. Reynolds Tobacco Co., 577 A.2d 1239
(N.J. 1990), rev'g in part 542 A.2d 919 (N.J. Super. Ct. App. Div.
1988), aff'g 523 A.2d 712 (N.J. Super. Ct. Law Div. 1986).


 In Dewey, the widow of a smoker who had died of lung
cancer sued under theories of design defect, failure to warn, and
misrepresentation. The defendants filed a motion to dismiss on the
ground that all claims were preempted by the Labeling Act. The
trial court, believing itself bound by the Third Circuit's ruling
in Cipollone I, dismissed the claims founded on failure to warn and
misrepresentation. 523 A.2d at 716. However, the court held that
the plaintiff's design defect claim was not preempted, even under
Cipollone I, and denied the motion as to that claim. Id. at 716-18. On appeal, the appellate division of the superior court held
that it was unnecessary to determine whether or not it was bound by
the holding in Cipollone I, because it had concluded, on
independent review, that the trial court's judgment was correct and
should be affirmed. 542 A.2d at 920. On further appeal, the New
Jersey Supreme Court reversed the preemption-based dismissal,
holding that (1) it was not bound by Cipollone I, and (2) the
Labeling Act did not preempt any of the plaintiff's claims,
including that founded on failure to warn. 577 A.2d at 1243-44.

 10. Rogers v. R.J. Reynolds Tobacco Co., 557 N.E.2d 1045
(Ind. Ct. App. 1990).


 In Rogers, the widow of a deceased cigarette smoker sued
under three theories: (1) failure to warn, (2) design defect, and
(3) fraud, constructive fraud, and fraudulent concealment. The
trial court granted summary judgment in favor of defendants,
apparently without specifying a basis. Relying on Cipollone I, the
Indiana Court of Appeals held that the plaintiff's post-1965
failure-to-warn and fraud claims were preempted. 557 N.E.2d at
1050-51, 1055. The court held, however, that the design-defect
claim was not preempted. Id. at 1051.


CONCLUSIVENESS OF LOWER FEDERAL COURT DECISIONS


 As discussed above, the five federal courts of appeals
that have written on the preemptive effect of the Labeling Act are
unanimous in their conclusion that common-law failure-to-warn
claims, at least, are preempted. See Pennington, 876 F.2d 414;
Roysdon, 849 F.2d 230; Palmer, 825 F.2d 620; Stephen, 825 F.2d 312;
Cipollone, 789 F.2d 181. This raises the threshold issue of
whether this Court is bound by decisions of lower federal courts on
questions of interpretation of federal statutes. We conclude we
are not.

 This Court has held that "[w]hile a decision of a federal
court, other than the Supreme Court, may be persuasive in a state
court on a federal matter, it is, nevertheless, not binding, since
the state court owes obedience to only one federal court, namely,
the Supreme Court." Barstow v. State, 742 S.W.2d 495, 501 n.2
(Tex. App. 1987, writ denied) (quoting from Moore & Oglebay, The
Supreme Court, Stare Decisis and Law of the Case, 21 Tex. L. Rev.
514, 525 (1943)); accord Turner v. PV Int'l Co., 765 S.W.2d 455,
470 (Tex. App. 1988), writ denied per curiam, 778 S.W.2d 865 (Tex.
1989); Omniphone, Inc. v. Southwestern Bell Tel. Co., 742 S.W.2d
523, 526 (Tex. App. 1987, no writ); Woodard v. Texas Dept. of Human
Resources, 573 S.W.2d 596, 598 (Tex. Civ. App. 1978, writ ref'd
n.r.e.); cf. Summertree Venture III v. FSLIC, 742 S.W.2d 446, 449-50 (Tex. App. 1987, writ denied).

 The rationale for this view is well summarized in the
following passage:



[T]he state courts, when adjudicating federal questions,
form an integral part of the national judicial hierarchy
and apply their own law, not that of another sovereign. 
In that capacity they occupy exactly the same position as
the lower federal courts, which are coordinate, and not
superior to them. There is no appeal from the state to
the lower federal courts. Instead both are subject to
the reviewing power of the Supreme Court, which furnishes
the unifying principle. Decisions of a lower federal
court are no more binding on a state court than they are
on a federal court not beneath it in the judicial
hierarchy.


Note, Authority in State Courts of Lower Federal Court Decisions on
National Law, 48 Colum. L. Rev. 943, 946-47 (1948) (footnotes
omitted). These sound principles seem to represent the majority
view among the states. See Annotation, Duty of state courts to
follow decisions of Federal courts, other than the Supreme Court,
on Federal questions, 147 A.L.R. 857 (1943).

 In Olson v. Holmes, 571 S.W.2d 211 (Tex. Civ. App. 1978),
writ ref'd n.r.e. per curiam, 587 S.W.2d 678 (Tex. 1979), this
Court, faced with conflicting constructions of a federal statute by
a state court of appeals and a federal court of appeals, opted to
follow the federal court. This Court's opinion stated that,
because we were dealing with rights conferred by federal statute
and regulation, "our determination of the appeal should be governed
by the federal courts' construction of the statute and regulation." 
571 S.W.2d at 213. In so stating, we did not intend to hold that
this Court was absolutely bound by the decisions of lower federal
courts, but only to acknowledge that such decisions are entitled to
due weight and consideration. Therefore, we accord a like meaning
to the Texas Supreme Court's per curiam opinion in Olson, in which
it echoed and approved this Court's "should-be-governed-by"
language. 587 S.W.2d at 679.

 Accordingly, we conclude that, although they have
persuasive value, lower federal court opinions interpreting the
Labeling Act are not conclusive in this appeal.



GENERAL PREEMPTION PRINCIPLES


 The supremacy clause of the United States Constitution
provides: "This Constitution, and the Laws of the United States
which shall be made in Pursuance thereof . . . shall be the supreme
Law of the Land . . . any Thing in the Constitution or Laws of any
State to the Contrary notwithstanding." U.S. Const. art. VI, cl.
2. The question whether, pursuant to the supremacy clause, a
particular federal law preempts state action is "largely a matter
of statutory construction." L. Tribe, American Constitutional Law
480 (2d ed. 1988). An examination of congressional intent is
required. Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 299
(1988).

 The following passage summarizes the general principles
of preemption:


Federal law may supersede state law in several different
ways. First, when acting within constitutional limits,
Congress is empowered to pre-empt state law by so stating
in express terms. E.g., Jones v. Rath Packing Co. 430 US

519, 525, 51 L Ed 2d 604, 97 S Ct 1305 (1977). Second,
congressional intent to pre-empt state law in a
particular area may be inferred where the scheme of
federal regulation is sufficiently comprehensive to make
reasonable the inference that Congress "left no room" for
supplementary state regulation. Rice v. Santa Fe
Elevator Corp. 331 US 218, 230, 91 L Ed 1447, 67 S Ct
1146 (1947). . . .


As a third alternative, in those areas where Congress has
not completely displaced state regulation, federal law
may nonetheless pre-empt state law to the extent it
actually conflicts with federal law. Such a conflict
occurs either because "compliance with both federal and
state regulations is a physical impossibility," Florida
Lime & Avocado Growers, Inc. v. Paul, 373 US 132, 142-143, 10 L Ed 2d 248, 83 S Ct 1210 (1963), or because the
state law stands "as an obstacle to the accomplishment
and execution of the full purposes and objectives of
Congress." Hines v. Davidowitz, 312 US 52, 67, 85 L Ed
581, 61 S Ct 399 (1941).


California Federal Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 280-81 (1987). The starting point in any preemption analysis is "the
basic assumption that Congress did not intend to displace state
law." Maryland v. Louisiana, 451 U.S. 725, 746 (1981).

 No court has held that the Labeling Act expressly
preempts common-law tort claims by persons injured from smoking
cigarettes; nor has any court held that the Labeling Act so
comprehensively "occupies the field" as to preempt common-law
claims on that basis; nor has any court held that it would be
impossible to comply with both the Labeling Act and any adverse
judgments that might grow out of common-law tort claims. We
likewise decline to find common-law claims preempted on any of
those bases. Accordingly, the issue this Court must decide is
whether the availability of state common-law tort remedies to
persons injured by smoking cigarettes impedes the accomplishment
and execution of the purposes and objectives of the Labeling Act to
such a degree that we should infer a congressional intent to
eliminate such remedies.


PREEMPTION OF DAMAGE AWARDS


 More than thirty years ago the Supreme Court, in deciding
whether a claim for damages was preempted, stated that


[o]ur concern is with delimiting areas of conduct which
must be free from state regulation if national policy is
to be left unhampered. Such regulation can be as
effectively exerted through an award of damages as
through some form of preventive relief. The obligation
to pay compensation can be, indeed is designed to be, a
potent method of governing conduct and controlling
policy. Even the States' salutary effort to redress
private wrongs or grant compensation for past harm cannot
be exerted to regulate activities that are potentially
subject to the exclusive federal regulatory scheme.


San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 246-47
(1959). Although Garmon concerned the primary jurisdiction of the
National Labor Relations Board and Garmon's claim was founded on a
statutory -- rather than common-law -- cause of action, the case
firmly established the principle that damage awards can have a
regulatory effect and, where appropriate, damage claims will be
subject to preemption.

 In the course of balancing state and federal interests to
protect the primary jurisdiction of the NLRB, the Supreme Court has
recognized numerous exceptions to strict application of the Garmon
preemption doctrine, most notably where the state activity in
question touches interests that are "deeply rooted in local feeling
and responsibility." Garmon, 359 U.S. at 244; cf. Brown v. Hotel
and Restaurant Employees, 468 U.S. 491, 502-03 (1984). The Court
has said that "inflexible application of the [Garmon] doctrine is
to be avoided, especially where the State has a substantial
interest in regulation of the conduct at issue and the State's
interest is one that does not threaten undue interference with the
federal regulatory scheme." Farmer v. United Brotherhood of
Carpenters, 430 U.S. 290, 302 (1977). Such holdings are
instructive in the present case, though our factual setting is
distinct.


THE PRESUMPTION AGAINST PREEMPTION


 As stated previously, the Supreme Court recognizes a
basic presumption against preemption. Maryland v. Louisiana, 451
U.S. at 746. In matters traditionally regulated by states and
localities, however, that presumption is even stronger: "[When
Congress legislates] in a field which the States have traditionally
occupied . . . we start with the assumption that the historic
police powers of the States were not to be superseded by the
Federal Act unless that was the clear and manifest purpose of
Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230
(1947) (emphasis added). Stated differently, "we are not to
conclude that Congress legislated the ouster of [a state statute]
. . . in the absence of an unambiguous congressional mandate to
that effect." Florida Lime & Avocado Growers, Inc. v. Paul, 373
U.S. 132, 146-47 (1963) (emphasis added). As Professor Tribe has
stated,


As a corollary of the rule that state action will not
lightly be found to be inconsistent with federal policy,
not only are broad and abstract federal goals given scant
preemptive effect, but even congressional goals that are
tightly-stated will be interpreted narrowly when testing
traditional forms of state action for conflict with those
goals.


L. Tribe, supra at 489.

 The Labeling Act touches directly on matters of public
health and safety. Therefore, the Act regulates in an area of
traditional state control. See Hillsborough County v. Automated
Medical Laboratories, Inc., 471 U.S. 707, 719 (1985) ("[T]he
regulation of health and safety matters is primarily, and
historically, a matter of local concern.").

 Nonetheless, one of the defendants urges us to adopt the
view of the Eleventh Circuit expressed in Taylor v. General Motors
Corp., 875 F.2d 816 (11th Cir. 1989), cert. denied, U.S. ,
110 S.Ct. 1781 (1990):


[I]n contrast to the strong presumption against
preemption that we apply in determining whether the
language of a federal statute or regulation expressly
preempts state law, no such presumption is applicable in
deciding whether state law conflicts with federal law,
even where the subject of the state law is a matter
traditionally regarded as properly within the scope of
the states' rights. See Felder v. Casey, U.S. , 
 , 108 S.Ct. 2302, 2306, 101 L.Ed.2d 123 (1988). . . .


875 F.2d at 826.

 We think Taylor paints with too broad a brush. First,
the case cited as support for the proposition, Felder v. Casey, 487
U.S. 131 (1988), in fact provides no support. The Court in Felder
did not hold, or even imply, that no presumption against preemption
existed in conflict-preemption cases. The Wisconsin Supreme Court
had ordered dismissal of a plaintiff's civil rights action, brought
under 42 U.S.C. § 1983 (1981), for failure to comply with
Wisconsin's 120-day notice-of-claim statute. 408 N.W.2d 19. The
Wisconsin court reasoned, in part, that the notice requirement
advanced "the State's legitimate interests in protecting against
stale or fraudulent claims, facilitating prompt settlement of valid
claims, and identifying and correcting inappropriate conduct by
governmental employees and officials." 487 U.S. at 137. In
responding to this argument, the United States Supreme Court merely
quoted the following rule:


Under the Supremacy Clause of the Federal Constitution,
"[t]he relative importance to the State of its own law is
not material when there is a conflict with a valid
federal law," for "any state law, however clearly within
a State's acknowledged power, which interferes with or is
contrary to federal law, must yield." Free v. Bland, 369
US 663, 666, 8 LEd2d 180, 82 SCt 1089 (1962).


487 U.S. at 138. Like Felder, Free v. Bland, 369 U.S. 663 (1962),
was a case in which actions authorized by federal law directly
conflicted with state law. In Free, federal law authorized
survivorship provisions in United States Savings Bonds. Texas
community property law, however, had been held to disallow any
agreement to a survivorship provision with regard to community
property. See Hilley v. Hilley, 342 S.W.2d 565 (Tex. 1961). A
more direct conflict can hardly be imagined. 

 We agree wholeheartedly that, as a practical matter,
where a right expressly granted by federal law is conditioned or
limited by state law, or an action expressly authorized by federal
law violates state law, the "relative importance to the State of
its own law is not material." Logic and the supremacy clause
dictate this result. Not all conflict-preemption cases involve
such direct and unmistakable conflicts, however. Indeed, the
Supreme Court has recognized a distinction between, on the one
hand, "impossibility" cases such as Florida Avocado Growers and
"outright or actual conflict" cases such as Free and, on the other
hand, "obstacle" or "frustration" cases such as Hines v.
Davidowitz, 312 U.S. 52 (1941). See Louisiana Public Service
Comm'n v. FCC, 476 U.S. 355, 368-69 (1986). The latter category of
cases can present very difficult statutory-construction and policy
questions. The congressional objective may be difficult to
ascertain. Or, the congressional enactment may have multiple
objectives, some more important than others. The effect of state
law on congressional objectives may be quite mild. Or, the overall
effect of state law may be difficult to predict, particularly in
the instance of multiple congressional goals. It is in such close
and difficult cases that a presumption against preemption seems to
us most appropriate:


By declining to infer preemption in the face of
congressional ambiguity, the Court is not interposing a
judicial barrier to Congress's will in order to protect
state sovereignty -- an interposition that would violate
Garcia [v. San Antonio Metropolitan Transit Authority,
469 U.S. 528 (1985)] -- but is instead furthering the
spirit of Garcia by requiring that decisions restricting
state sovereignty be made in a deliberate manner by
Congress, through the explicit exercise of its lawmaking
power to that end.


L. Tribe, supra at 480.

 In addition, the Supreme Court itself obviously does not
follow the Taylor court's interpretation of Felder. In California
v. ARC America Corp., 490 U.S. , 104 L.Ed.2d 86 (1989), a case
decided after Felder, the Court expressly recognized that
"[a]ppellees' only contention [in this case] is that state laws
permitting indirect purchaser recoveries pose an obstacle to the
accomplishment of the purposes and objectives of Congress." 104
L.Ed.2d at 95. Nonetheless, the Court held that:


In this case, in addition, appellees must overcome the
presumption against finding pre-emption of state law in
areas traditionally regulated by the States. See
Hillsborough County v. Automated Medical Laboratories,
Inc. 471 US 707, 716, 85 LEd2d 714, 105 SCt 2371 (1985). 
When Congress legislates in a field traditionally
occupied by the States, "we start with the assumption
that the historic police powers of the States were not to
be superseded by the Federal Act unless that was the
clear and manifest purpose of Congress." Rice v. Santa
Fe Elevator Corp. 331 US 218, 230, 91 LEd 1447, 67 SCt
1146 (1947).


Id. at 94.

 We conclude, therefore, that the present case requires
application of the "heightened" presumption against preemption
described in the foregoing cases.


DISCUSSION: PREEMPTION BY THE LABELING ACT IN THE PRESENT CASE


 We have identified six factors that lead us to conclude
that the Labeling Act does not reflect a clear, manifest, and
unambiguous congressional intent to preempt the common-law tort
claims alleged by the plaintiffs in the present case: (1) The
"frustrating" effect of such claims on congressional goals is
speculative; (2) Avoiding diverse labeling regulations is the
secondary goal of the Act; the primary goal -- informing the public
of the hazards of cigarette smoking -- would arguably be enhanced
by permitting common-law tort claims; (3) A holding that the
plaintiffs' claims are preempted would leave them without any
remedy for the defendants' allegedly tortious conduct; (4) Congress
could easily have expressly preempted common-law tort claims, but
did not do so; (5) The legislative history of the Labeling Act
gives no indication that Congress intended to preempt common-law
tort claims; and (6) The Comprehensive Smokeless Tobacco Health
Education Act of 1986 evinces congressional intent that common-law
tort claims not be preempted.

 We note initially that the defendants' strongest case for
preemption lies with failure-to-warn claims. Indeed, Pennington,
Forster, and Hite, while concluding that failure-to-warn claims are
preempted, determined that claims based on other legal theories are
not. Accordingly, in the following discussion we will, where
appropriate, focus our analysis on failure-to-warn claims, with the
understanding that we consider claims based on other theories to be
even stronger against preemption.

 1. Speculative conflict

 The "obstacle" standard for determining whether state law
"actually conflicts" with federal law was enunciated in Hines v.
Davidowitz, 312 U.S. 52, 67-68 (1941):


In the final analysis, there can be no one crystal clear
distinctly marked formula. Our primary function is to
determine whether under the circumstances of this
particular case, [the state] law stands as an obstacle to
the accomplishment and execution of the full purposes and
objectives of Congress.[20]

 


[20] Cf. Savage v. Jones, 225 US 501, 533, 56 L ed 1182,
1195, 32 S Ct 715: ". . . If the purpose of the act
cannot otherwise be accomplished -- if its operation
within its chosen field else must be frustrated and its
provisions be refused their natural effect -- the state
law must yield to the regulation of Congress within the
sphere of its delegated power."


 Defendants argue that permitting claims such as those
alleged by the plaintiffs will frustrate the "uniformity" goal
stated in section 1331 of the Labeling Act: 


[That] commerce and the national economy may be (A)
protected to the maximum extent consistent with this
declared policy [of informing the public of the health
hazards of cigarette smoking] and (B) not impeded by
diverse, nonuniform, and confusing cigarette labeling and
advertising regulations with respect to any relationship
between smoking and health.


15 U.S.C. § 1331. We disagree. By awarding damages, courts do not
compel any behavior, other than requiring a particular defendant to
pay compensation to a particular plaintiff:


A damages award . . . requires only payment -- it is not
an injunction requiring the defendant to incorporate into
its advertising a fixed legend different from the
federally required label. The labeling acts do not
prohibit a manufacturer from warning of undisclosed
health risks. The only prohibition is against a state
agency passing a law requiring cigarette companies to use
a different label.


Garner, Cigarette Dependency and Civil Liability: A Modest
Proposal, 53 S. Cal. L. Rev. 1423, 1454 (1980).

 We are mindful that a damages award may motivate a
defendant to change his future behavior voluntarily, but what the
nature of that change will be is purely speculative. A cigarette
manufacturer that was required to pay a damages award because it
had failed to adequately warn of the hazards of smoking cigarettes
would have several options. For example, the manufacturer could
choose to increase the safety of its product. Or, it could choose
simply to absorb the expense of any damage awards, either by
raising prices or by decreasing its profit margin. As Justice
Blackmun stated in his dissent in Silkwood v. Kerr-McGee Corp., 464
U.S. 238 (1984),


When a victim is determined to be eligible for a
compensatory award, that award is calculated by reference
to the victim's injury. Whatever compensation standard
a State imposes, whether it be negligence or strict
liability, a [nuclear] licensee remains free to continue
operating under federal standards and to pay for the
injury that results.


464 U.S. at 264 (Blackmun, J., dissenting). Or, the manufacturer
could include additional health information in cigarette packages
without changing the package and advertisement warnings. Finally,
the manufacturer could, of course, choose to increase the strength
of its warning. As noted by the district court in Cipollone I,
which course the producer of a defective product takes "depends
upon a complex combination of economics, morality and psychology." 
593 F.Supp. at 1156.

 In light of the manufacturers' options and the variables
that influence their choices, it is simply not clear that common-law damage awards against cigarette manufacturers would result in
the "diverse, nonuniform, and confusing cigarette labeling and
advertising regulations" Congress sought to avoid through the
Labeling Act. We conclude, therefore, that the potential conflict
asserted by defendants is too speculative to warrant preemption. 
See English v. General Elec. Co., U.S. , 110 L.Ed.2d 65, 81
(1990) ("[P]reemption is ordinarily not to be implied absent an
'actual conflict.'"); Rice v. Norman Williams Co., 458 U.S. 654,
659 (1982) ("The existence of a hypothetical or potential conflict
is insufficient to warrant the pre-emption of the state statute.");
Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 446
(1960) ("[T]his Court's decisions . . . enjoin seeking out
conflicts between state and federal regulation where none clearly
exists.").

 2. Secondary goal

 The Third Circuit in Cipollone stated that the Labeling
Act represented "a carefully drawn balance between the purposes of
warning the public of the hazards of cigarette smoking and
protecting the interests of national economy." 789 F.2d at 187. 
The First Circuit in Palmer stated that, although the Act had two
"policies," it had "only one purpose: to strike a fair, effective
balance between these two competing interests." 825 F.2d at 626. 
Our reading of the Act and its legislative history reveals no such
delicate balance.

 The primary purpose of the Act is to inform the public of
the hazards of cigarette smoking. The legislative history of the
Act indicates plainly that "[t]he principal purpose of the bill is
to provide adequate warning to the public of the potential hazards
of cigarette smoking . . . ." 1965 U.S. Code Cong. & Admin. News
2350. (5) The policy of protecting commerce and the economy is
secondary, being protected only to the extent "consistent with this
declared policy," i.e., the policy of informing the public.


Instead of treating "these two competing interests"
equally, Congress subordinated the economic interests of
the tobacco industry and the national economy to the more
pressing interests of public health and information. 
Thus, state tort actions cannot disrupt excessively a
carefully drawn balance of purpose that is, in fact, no
balance at all.


Comment, Inadequate Warning Claims Preempted by Cigarette Labeling
Act: Palmer v. Liggett Group, Inc., 34 Loy. L. Rev. 419, 430
(1988).

 Moreover, holding common-law claims preempted would
remove the motivation for cigarette manufacturers to voluntarily
include additional health information and/or warnings in or on
cigarette packages and advertisements. That sort of disincentive
would actually hinder the Act's primary purpose of achieving wide
dissemination of such information. We find it difficult to believe
that Congress would have built such a contradiction into the Act. 
In response to a similar contention, the Court of Appeals for the
District of Columbia Circuit stated:


[I]f we are to adopt [the cigarette manufacturers']
analysis, we must conclude that Congress legislated to
curtail the potential flow of information lest the public
learn too much about the hazards of smoking for the good
of the tobacco industry and the economy. We are loathe
[sic] to impute such a purpose to Congress absent a clear
expression.


Banzhaf v. FCC, 405 F.2d 1082, 1089 (D.C. Cir. 1968), cert. denied, 
396 U.S. 842 (1969).

 3. No Remedy.

 The Labeling Act provides no federal remedies,
administrative or otherwise, for persons who claim to have been
harmed as a result of cigarette manufacturers' tortious conduct. 
Thus, preemption in the present case would leave the plaintiffs
without a remedy.

 The United States Supreme Court has generally been
unwilling to permit such a result. For example, in United
Construction Workers v. Laburnum Construction Corp., 347 U.S. 656
(1954), a labor case, the Court used the following words to
distinguish an earlier ruling:


In [Garner v. Teamsters C. & H. Local Union, 346 U.S. 485
(1953)], Congress had provided a federal administrative
remedy, supplemented by judicial procedure for its
enforcement, with which the state injunctive procedure
conflicted. Here Congress has neither provided nor
suggested any substitute for the traditional state court
procedure for collecting damages for injuries caused by
tortious conduct. For us to cut off the injured
respondent from this right of recovery will deprive it of
its property without recourse or compensation. To do so
will, in effect, grant petitioners immunity from
liability for their tortious conduct. We see no
substantial reason for reaching such a result.


347 U.S. at 663-64 (footnote omitted). The plaintiff in Linn v.
United Plant Guard Workers, 383 U.S. 53 (1966), another labor case,
sought damages for malicious libel. In concluding that state
common-law remedies were not preempted, the Court stressed that the
"inability [of the National Labor Relations Board] to provide
redress to the maligned party[] vitiates the ordinary arguments for
pre-emption." Id. at 64; see also Farmer, 430 U.S. at 298. Thus,
even in the area of labor law, where the interests of the federal
government have long been recognized as preeminent, the Supreme
Court has been reluctant to preempt state common-law tort claims.

 The Supreme Court has taken a similar view outside the
labor law context. In Silkwood, the Court held that a state
common-law tort claim was not preempted by the Atomic Energy Act,
notwithstanding that less than a year earlier, in Pacific Gas &
Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461
U.S. 190 (1983), the Court had held that, with narrow exceptions,
the federal government had "occupied the entire field of nuclear
safety concerns." 461 U.S. at 212-13. Justice White, writing for
the Silkwood majority, stated that the failure of Congress to
expressly preempt state-law remedies 


takes on added significance in light of Congress' failure
to provide any federal remedy for persons injured by such
conduct. It is difficult to believe that Congress would,
without comment, remove all means of judicial recourse
for those injured by illegal conduct. See Construction
Workers v. Laburnum Corp., 347 US 656, 663-664, 98 LEd
1025, 74 SCt 833 (1954).


464 U.S. at 251 (emphasis added). In dissent, Justice Blackmun
echoed this dim view of leaving injured persons without a remedy:


Because the Federal Government does not regulate the
compensation of victims, and because it is inconceivable
that Congress intended to leave victims with no remedy at
all,[7] the pre-emption analysis established by Pacific Gas
comfortably accommodates -- indeed it compels -- the
conclusion that compensatory damages are not pre-empted
whereas punitive damages are.

 


[7] . . . The absence of federal regulation governing the
compensation of victims of nuclear accidents is strong
evidence that Congress intended the matter to be left to
the States.


464 U.S. at 263-64 (Blackmun, J., dissenting) (emphasis added).

 In the context of this discussion, the distinction
between common-law remedies and statutory remedies may also be
significant. Common-law tort remedies reflect a recognition, often
of many centuries' duration, that a person injured by wrongful
conduct is entitled to some sort of remedy against the tortfeasor
to compensate for his injuries. They reflect a conclusion that
society ought, for the good of the whole, to formally sanction and
assist in enforcing such remedies. To take from an injured person
all such remedies, without any replacement, threatens the very
foundation of our legal system: "[T]he refusal to redress an
otherwise actionable wrong creates disrespect for the law and
encourages the victim to take matters into his own hands." Linn,
383 U.S. at 64 n.6. To infer that Congress set out to eliminate
such remedies without even commenting on their elimination would be
even more perilous.

 Statutory remedies, on the other hand, while representing
the conclusion of a legislature that certain conduct should be
compensable, do not carry the sanction of ancient societal
expectations. Indeed, legislatures have been known to create
relatively fleeting rights: here today, gone tomorrow. Moreover,
in the context of state and federal relations, it is significant
that the purpose of a legislatively created cause of action is more
likely to be regulation of conduct than compensation of victims. 
Although the purpose of a state law is not a major factor to be
considered in deciding preemption questions, Perez v. Campbell, 402
U.S. 637, 651-52 (1971), it cannot be ignored, Pacific Gas &
Electric, 461 U.S. at 216.

 At least one federal court of appeals has held that a
full-blown balancing of state and federal interests, presumably
similar to that required before Garmon-preemption may be applied,
is appropriate in the present analysis:


A decision about preemption on that ground [,i.e.,
frustration of federal purpose] requires the court
independently to consider national interests and their
putative conflict with state interests. While preemption
under a theory of express or implied preemption is
essentially a matter of statutory construction,
preemption under a frustration of federal purpose theory
is more an exercise of policy choices by a court than
strict statutory construction.


Abbot v. American Cyanamid Co., 844 F.2d 1108, 1113 (4th Cir.
1988). While we express no disagreement with this conclusion, the
present case does not demand a determination of the issue. A
holding of preemption would leave plaintiffs, allegedly injured by
the tortious conduct of defendants, without a remedy. If, by our
inquiry into the Labeling Act, we are truly seeking congressional
intent, we cannot ignore a consequence of such import.


 4. Congressional silence

 Smokers who have developed lung cancer and other diseases
have been suing cigarette manufacturers under state tort law since
at least as far back as the 1950's. See Comment, The Product
Liability of the Tobacco Industry: Has Cipollone v. Liggett Group
Finally Pierced the Cigarette Manufacturers' Aura of
Invincibility?, 30 B.C.L. Rev. 1103, 1117-26 (1989). The Supreme
Court has held, as early as 1959, that damage awards can have a
regulatory effect and that damage suits under state law are subject
to being preempted by federal statutes. See Garmon, 359 U.S. at
247. The Supreme Court has been stating since at least 1947 that,
in areas traditionally regulated by the states, such as health and
safety, courts will presume that preemption of state law was not
intended unless the contrary is shown to be the "clear and manifest
purpose of Congress." Rice, 331 U.S. at 230. We must presume that
Congress was aware of such lawsuits and judicial decisions when it
passed and later amended the Labeling Act.

 Yet, when Congress decided to include an express
preemption provision in the Labeling Act, it made no mention of
preempting damage suits or awards. All courts, including the five
federal courts of appeals cited above, agree that the Labeling Act
does not expressly preempt common-law claims. Given the "drastic
clarity" with which Congress can speak when it so desires, and
considering that in section 1334 of the Act it spoke with some
clarity about other areas of preemption, its failure to speak on
the subject of common-law claims is significant. Even in Hines,
the Supreme Court recognized that "where the Congress, while
regulating related matters, has purposely left untouched a
distinctive part of a subject which is peculiarly adapted to local
regulation, the state may legislate concerning such local matters
which Congress could have covered but did not." 312 U.S. at 68
n.22. Although there may be "manifest dangers in trying to discern
the tune when listening to the sounds of Congressional silence
. . . the benefit of the doubt in our Federal system is tilted
against Federal pre-emption of state law: the symphonic tie
normally goes to the plaintiffs." L. Tribe, Federalism With Smoke
and Mirrors, The Nation 788, 788-89 (June 7, 1986).

 5. Legislative history

 Although reliance on legislative history to discern
congressional intent is "a step to be taken cautiously," Piper v.
Chris-Craft Indus., Inc., 430 U.S. 1, 26 (1977), the legislative
history of the Labeling Act is significant for our purposes in at
least three respects. First, in virtually every congressional
discussion, statements about preemption are couched in terms of
"laws" or "regulations" in the sense of legislative enactments,
rather than "regulation" in a broader sense. During the 1965
debates, for example, House Report No. 449 described congressional
fear that "a multiplicity of State and local regulations pertaining
to labeling of cigarette packages could create chaotic marketing
conditions and consumer confusion." 1965 U.S. Code Cong. & Admin.
News 2350, 2352. In 1969 the Senate Commerce Committee stated the
following in Senate Report No. 91-566:


In some instances, counties or municipalities exercise
their authority over advertising by local ordinances, or
regulations, or even occasionally by resolution. In
order to avoid the chaos created by a multiplicity of
conflicting regulations, however, the bill preempts State
requirements or prohibitions with respect to the
advertising of cigarettes based on smoking and health. 
This preemption is intended to include not only action by
State statute but by all other administrative actions or
local ordinances or regulations by any political
subdivision of any State.


1970 U.S. Code Cong. & Admin. News 2652, 2663. In addition,
individual statements by senators, congressmen, and other
interested parties seem to reflect the same focus. See the
numerous examples cited by the district court in Cipollone I, 593
F.Supp. at 1159-61. 

 Second, the congressional reports, debates, and
discussions touching on the preemption issue contain no mention
whatsoever of preempting common-law tort claims. In light of the
strong presumption against preemption, such silence is telling. 
"[T]he conspicuous absence [in congressional debates] of any
reference to the preemption of state common law claims . . .
evidences Congress' intention to preclude only state and local
legislatures from passing conflicting labeling laws." Comment,
Common Law Claims Challenging Adequacy of Cigarette Warnings
Preempted Under the Federal Cigarette Labeling and Advertising Act
of 1965: Cipollone v. Liggett Group, Inc., 60 St. John's L. Rev.
754, 762 n.32 (1986).

 Finally, even the discussions that mention common-law
claims do so in the context of considering the effect of the Act on
a defendant's "assumption of the risk" defense in a tort action:


MR. MACKAY: I would like to ask you this as a lawyer. 
Would not the presence of the type of warning suggested
in these bills greatly strengthen the hand of a defendant
in a tort case?


MR. ELLENBOGEN: In the long run it might do so, because
those cases that I have read -- and I have not made a
real study of this particular thing -- but the Green
case, for example, is based, I believe, on the implied
warranty of fitness, and there being no notice of the
health hazard to the consumer.


Hearings on H.R. 2248, 3014, 4007, and 4249 Before the House
Committee on Interstate and Foreign Commerce, 89th Cong., 1st.
Sess. 176 (1965) (statement of Theodore Ellenbogen, Acting
Assistant General Counsel of the Department of Health, Education,
and Welfare). See also Cipollone I, 593 F.Supp. at 1162-63. The
very existence of debate over the effect of the Act on substantive
defenses is inconsistent with the notion that Congress intended to
preempt common-law claims.

 6. Smokeless Tobacco Act

 Also worthy of note on the issue of congressional intent
is the passage in 1986 of the Comprehensive Smokeless Tobacco
Health Education Act, 15 U.S.C. §§ 4401-4408 (Supp. 1990)
(Smokeless Tobacco Act). The legislative history of that Act
indicates that its passage was spurred by the recent resurgence of
smokeless tobacco products. Not surprisingly, it was patterned
after the Labeling Act: "[The Smokeless Tobacco Act], for the most
part, simply extends the provisions of P.L. 98-474, the
Comprehensive Smoking Education Act of 1984, to include smokeless
tobacco products." 1986 U.S. Code Cong. & Admin. News 7, 11.

 Although patterned after the Labeling Act, the Smokeless
Tobacco Act contains some significant differences from its source.
Chief among these, for our purposes, is the presence in the
preemption section of the following provision: "Nothing in this
chapter shall relieve any person from liability at common law or
under State statutory law to any other person." 15 U.S.C.
§ 4406(c).

 Although an analysis of the various differences between
the two Acts seems to us a highly problematic inquiry, two
conclusions can readily be drawn. First, although the Smokeless
Tobacco Act does not contain an express statement of purpose, as
the Labeling Act does, logic compels the conclusion that their
purposes are parallel, if not identical: (1) to inform the public
about the dangers of tobacco product use, and (2) to protect
commerce as much as possible, consistent with the primary objective
of informing the public of health hazards, by preventing diverse
labeling regulations. Second, by expressly providing that state
common-law claims were not preempted, Congress indicated its belief
that such claims would not unduly frustrate its goal of preventing
diverse labeling regulations:


The existence of a savings clause in the Smokeless
[Tobacco] Act could be helpful to either side of the
preemption debate. The more reasonable interpretation of
this legislation, however, is that it expresses the
ongoing, unchanging, undiminished intent of Congress not
to preclude common-law causes of action for failure to
warn against the tobacco industry.


Comment, Preemption of Recovery in Cigarette Litigation: Can
Manufacturer Be Sued for Failure to Warn Even Though They Have
Complied with Federal Warning Requirements?, 20 Loyola L.A.L. Rev.
867, 918-19 (1987).




FLAWS OF PRIOR CIGARETTE CASES


 The cases holding common-law tort claims to be preempted
by the Labeling Act have been justifiably criticized. In the
leading case, Cipollone I, the court of appeals disregarded
legislative history, ignored the fact that preemption would leave
the plaintiff without a remedy, and gave little weight to the
heightened presumption against preemption. 789 F.2d 181. Of that
court's treatment of the preemption issue, Professor Tribe has
stated:


The Third Circuit [in Cipollone I], in reading Congress'
preemption language expansively, apparently found that
Congress meant to exempt the tobacco industry from the
choice, faced by manufacturers in virtually every other
industry, among increasing product safety, increasing
warnings, or paying damages to injured consumers. That
holding seems hard to square with Silkwood and with the
Supreme Court's admonition that there is an overriding
presumption that "Congress did not intend to displace
state law."


L. Tribe, supra at 490-91 (footnotes omitted). That critical view
has generally been echoed by other commentators. See Comment,
supra, 30 B.C.L. Rev. 1103 (1989); Comment, supra, 20 Loy. L.A.L.
Rev. 867 (1987); Edell & Walters, The Doctrine of Implied
Preemption in Products Liability Cases -- Federalism in the
Balance, 54 Tenn. L. Rev. 603 (1987) (in fairness, we note that the
authors of this article have represented plaintiffs in several
lawsuits against cigarette manufacturers); Comment, supra, 60 St.
John's L. Rev. 754 (1986).

 Finally, Judge Gibbons, the Chief Judge of the Third
Circuit, wrote in a concurring opinion to Cipollone II that


I believe that our interlocutory ruling [in Cipollone I]
on the preemptive effect of the Labeling Act, to the
extent that we reached a definitive ruling, was wrong as
a matter of law, and should be overruled by the court in
banc. . . . Thus, while I join in Part XII [the
preemption section] of the opinion of the court, I do so
only because this panel is bound by what I believe to be
an erroneous opinion of the Court.


893 F.2d at 583. In light of the number of courts that have
followed the preemption holding of Cipollone I, Judge Gibbons's
comments are tinged with irony.

 The decision in Palmer is likewise flawed. While Third,
Fifth, Sixth, and Eleventh Circuit panels incorrectly ignored the
consequence of leaving their respective plaintiffs without any
remedy, in Palmer the First Circuit brushed aside the plaintiff's
"no remedy" argument with two statements that are unsatisfactory,
at best. First, the court stated that, unlike the activities in
Silkwood and Laburnum, "cigarette smoking, at least initially, is
a voluntary activity." 825 F.2d at 627. Among other vices, this
statement -- without any support -- erroneously discounts the
possibility that smoking cigarettes could be shown to be addictive. 
Current medical research apparently supports the possibility of
such an addictive effect. (6) That addictive property, if shown to
exist, could transform what was initially a voluntary activity into
an involuntary one, effectively placing a prospective plaintiff in
exactly the same position as the plaintiffs in Silkwood and
Laburnum. (7) Indeed, the failure to warn of cigarettes' addictive
nature could be the essence of a plaintiff's complaint. (8) In such
a case, the fact that the plaintiff's smoking may have been
"initially" voluntary would be immaterial. Most importantly,
however, the statement in Palmer inserts into the preemption
decision a consideration that properly goes only to the merits of the case: by dismissing smoking as a "voluntary activity," the
First Circuit held the plaintiff's claim preempted because, at
least in part, he had "assumed the risk." This is improper
preemption analysis. The voluntariness of the plaintiff's actions
and the impact of that determination on the defendant's liability
are issues for resolution on the merits of the case, not as part of
the preemption decision.

 Next, the Palmer court opined that "[t]he Supreme Court
has often left parties without a remedy by finding state common law
preempted." Cited as authority for this proposition were Chicago
& North Western Transportation Co. v. Kalo Brick & Tile Co., 450
U.S. 311 (1981), and Farmers Union v. WDAY, 360 U.S. 525 (1959). 
Neither case supports the stated proposition. In Kalo Brick,
extensive administrative remedies were available to an aggrieved
party. Indeed, the Supreme Court felt compelled to state in its
opinion that "[o]ur decision today does not leave a shipper in
respondent's position without a remedy if it is truly harmed." 450
U.S. at 331. In WDAY, federal law expressly prohibited the
censorship of certain political speeches broadcast over the radio. 
The Court held that the statute's absolute prohibition gave radio
stations immunity from libel claims arising out of such political
speeches, i.e., common-law libel claims were preempted. Otherwise,
the Court noted, the federal statute "would sanction the
unconscionable result of permitting civil and perhaps criminal
liability to be imposed for the very conduct the statute demands of
the licensee." 360 U.S. at 531. We note initially that a person
harmed by libelous remarks contained in such a speech would still
have a cause of action against the maker of the speech and,
therefore, would not be left without a remedy. Moreover, the
statute in WDAY had the effect of mandating specific conduct, not
merely minimum conduct. (9) WDAY was, therefore, a case in which it
was not possible to comply with both the federal statute and state
tort law. We agree that it is appropriate in such "impossibility"
cases to infer congressional intent to preempt state damage claims
of all types. However, the proposition that the Supreme Court has
"often left parties without a remedy" by preempting state common-law tort claims in frustration-of-purpose cases is both incorrect
and contrary to a healthy balance of state and federal sovereignty:


[T]he [Supreme] Court is not in the practice of denying
aggrieved parties any avenue of relief; it simply finds
it acceptable to deprive them of one avenue when another
is available. The Palmer court, on the other hand, has
denied the plaintiffs their only avenue of relief, in
contravention of the language in Silkwood and other
cases. Instead of reaching to find preemption, courts
who are about to deny plaintiffs their only avenue for
compensation in an area traditionally controlled by state
law should carefully scrutinize federal law to find
unambiguous congressional intent to usurp the province of
the state.


Comment, supra, 34 Loy. L. Rev. at 431.


PREEMPTION CONCLUSION


 We agree with the Minnesota Court of Appeals in Forster
that "if there is a need to immunize the tobacco industry from tort
liability, that decision must be made by Congress in an unambiguous
mandate and not by the courts." 423 N.W.2d at 701 (emphasis in
original). We agree with the district court in Cipollone I that
"Congress intended that . . . whatever tension exists between
federal regulation of cigarette labeling and advertising and state
common law claims be tolerated." 593 F.Supp. at 1168. And we
agree with the Supreme Court of New Jersey in Dewey that "had
Congress intended to immunize cigarette manufacturers from
packaging, labeling, misrepresentation, and warning claims, it knew
how to do so with unmistakable specificity." 577 A.2d at 1251.

 We do not find in the Labeling Act and its legislative
history, either expressly or by necessary implication resulting
from conflict with state law, the clear, manifest, and unambiguous
expression of congressional intent needed to require preemption of
the common-law tort claims alleged here. The trial court's summary
judgment was improper.


MERITS OF PLAINTIFFS' CLAIMS


 One of the defendants, R.J. Reynolds Tobacco Company,
urges that, in the event this Court concludes that one or more of
the plaintiffs' causes of action are not preempted, we should
nonetheless affirm the trial court's judgment on the ground that
the pleadings and summary judgment evidence show conclusively that
none of the plaintiffs' claims is viable under substantive Texas
law. We decline to address this question, however, for the reasons
stated below.

 In the trial court, defendants moved for summary judgment
on two alternative grounds: (1) preemption, and (2) substantive
product liability and first amendment law. The trial court's
order, however, expressly recited that summary judgment was being
granted "on the basis that all of the claims asserted by the
plaintiffs . . . for the post-1965 era are preempted by the
provisions of the Cigarette Labeling and Advertising Act . . . and
the Supremacy Clause of the United States Constitution."

 A rule often followed by appellate courts is that "[i]n
reviewing the judgment of the trial court where there are no
findings of fact and conclusions of law requested or filed, the
judgment must be upheld on any legal theory that finds support in
the evidence." Strackbein v. Prewitt, 671 S.W.2d 37, 38 (Tex.
1984). Before 1978, a similar rule was followed in the review of
summary judgments:


[I]f it affirmatively appears from the pleadings,
admissions, depositions and affidavits that there is no
issue as to any material fact upon which the outcome of
the litigation depends, then summary judgment is the
proper remedy even though it be granted upon a ground
different from that specified in the motion.


In re Price's Estate, 375 S.W.2d 900, 903-04 (Tex. 1964); see also
Phil Phillips Ford, Inc. v. St. Paul Fire & Marine Ins. Co., 465
S.W.2d 933 (Tex. 1971); Trigg v. Blakemore, 387 S.W.2d 465 (Tex.
Civ. App. 1965, writ ref'd n.r.e.).

 In 1978, however, Rule 166a of the Texas Rules of Civil
Procedure was amended to require that a motion for summary judgment
"state the specific grounds therefor," and that "[i]ssues not
expressly presented to the trial court by written motion, answer or
other response shall not be considered on appeal as grounds for
reversal." Tex. R. Civ. P. 166a(c). In construing the effect of
the 1978 amendments to Rule 166a, the Texas Supreme Court has
expressed a strong concern that, in an appeal from a summary
judgment, issues to be reviewed by the appellate court must have
been actually presented to and considered by the trial court. City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 675-77 (Tex.
1979). Under Clear Creek and its progeny, a summary judgment can
be neither reversed nor affirmed on any ground not specifically
presented in the motion for summary judgment. Dhillon v. General
Accident Ins. Co., 789 S.W.2d 293, 295 (Tex. App. 1990, no writ);
Houston Lighting & Power Co. v. Wheelabrator Coal Services Co., 788
S.W.2d 933, 936 (Tex. App. 1990, no writ). Since 1978, therefore,
the rule stated in In re Price's Estate and similar cases is no
longer good law.

 What, then, of a summary judgment order that expressly
states the ground on which it is granted, when the underlying
motion contained other independent grounds on which summary
judgment was sought? We conclude that the ground specified in the
judgment is the only one on which the summary judgment can be
affirmed, for the following reasons. First, where a party has
sought summary judgment on grounds A and B, a judgment expressly
granting summary judgment on ground A, without mentioning ground B,
can only be construed to mean that the trial court did not consider
ground B. To construe it otherwise would be to permit and
encourage an inference that is neither warranted by the record nor
in keeping with the spirit of Rule 166a(c). Accordingly, we
conclude that the trial court in the present case did not consider
defendants' "substantive-law" argument in deciding to grant the
summary judgment. (10) Having reached this conclusion, it appears
obvious that a ground not considered by the trial court is
functionally identical to one not presented to the trial court; we
can conceive of no reason to treat them differently.

 Second, the following rule has, in the last ten years,
become well established:


Where a trial court enters a summary judgment order that
does not specify the particular ground on which it is
based, the party appealing must show that each
independent argument alleged in the motion for summary
judgment is insufficient to support the trial court's
order.


Insurance Co. of North America v. Security Ins. Co., 790 S.W.2d
407, 410 (Tex. App. 1990, no writ) (emphasis added). It is
significant that (1) every opinion citing this rule has taken care
to include the phrase emphasized above, indicating a unanimity of
thought that the rule applies only when the summary judgment order
does not specify the ground on which it is based; and (2) the rule
has arisen since 1978, indicating that its formulation may well
have been in response to the 1978 amendments to Rule 166a and to
the supreme court's 1979 opinion in Clear Creek. See Kyle v. West
Gulf Maritime Ass'n, 792 S.W.2d 805, 807 (Tex. App. 1990, no writ);
Law v. Law, 792 S.W.2d 150, 151 (Tex. App. 1990, writ denied); Rabe
v. Guaranty Nat'l Ins. Co., 787 S.W.2d 575, 576 (Tex. App. 1990,
writ denied); Tucker v. Atlantic Richfield Co., 787 S.W.2d 555, 558
(Tex. App. 1990, writ denied); Dyer v. Shafer, Gilliland, Davis,
McCollum & Ashley, Inc., 779 S.W.2d 474, 478-79 (Tex. App. 1989,
writ denied); Freedman v. Briarcroft Property Owners, Inc., 776
S.W.2d 212, 218 (Tex. App. 1989, writ denied); Tilotta v. Goodall,
752 S.W.2d 160, 161 (Tex. App. 1988, writ denied); FDIC v. Attayi,
745 S.W.2d 939, 942 (Tex. App. 1988, no writ); Netterville v.
Interfirst Bank, 718 S.W.2d 921, 922 (Tex. App. 1986, no writ); 
McCrea v. Cubilla Condominium Corp., 685 S.W.2d 755, 757 (Tex. App.
1985, writ ref'd n.r.e.); Southerland v. Northeast Datsun, Inc.,
659 S.W.2d 889, 891 (Tex. App. 1983, no writ); Thomson v. Norton,
604 S.W.2d 473, 476-77 (Tex. Civ. App. 1980, no writ). The logical
corollary to this rule is, of course, that where a summary judgment
order does specify the ground on which it is based, the party
appealing need not refute other independent grounds that may have
been alleged in the motion.

 We are aware of a contrary holding in Veytia v. Seiter,
740 S.W.2d 64 (Tex. App. 1987), aff'd, 756 S.W.2d 303 (Tex. 1988). 
In Veytia, as here, summary judgment was sought on two grounds,
federal preemption and substantive law. As here, the trial court's
order specified that summary judgment was being granted on
preemption grounds, apparently without mentioning the substantive-
law argument. After concluding that summary judgment was not
proper on preemption grounds, the appeals court decided that it was
obliged to review the substantive-law ground to see if the summary
judgment could be affirmed on that basis. Concluding that the
substantive-law argument did not support the summary judgment
either, the court reversed the trial court's judgment.

 We decline to follow Veytia. First, for its relevant
holding, the court in Veytia relied on In re Price's Estate and
other cases that were clearly undercut by the 1978 amendments to
Rule 166a. Moreover, it did so without any discussion of those
amendments or the supreme court's Clear Creek opinion. Second, the
Texas Supreme Court affirmed the court of appeals' reversal of the
summary judgment in Veytia solely on preemption grounds, without
addressing the substantive-law argument. If the correct rule were
that independent grounds contained in a motion for summary judgment
but not considered by the trial court could nonetheless be a basis
for the affirmance of a summary judgment, then the supreme court in
Veytia would also have been obligated to consider, and reject, the
substantive-law ground before it could affirm the court of appeals'
reversal of the summary judgment.

 We conclude, therefore, that the Veytia court incorrectly
decided to review the substantive-law ground to determine if the
summary judgment could be affirmed on that ground. We hold that
where, as here, a summary judgment order specifies the ground or
grounds on which it is based, without expressly ruling on other
independent grounds alleged in the motion, such other grounds may
not, on appeal, form the basis for affirming the summary judgment. 
On the basis of that holding, we decline to consider defendants'
substantive-law arguments in this appeal. (11)




CONCLUSION


 For the foregoing reasons, the judgment of the trial
court is reversed and the cause is remanded for further
proceedings.



 

 J. Woodfin Jones, Justice

[Before Justices Powers, Jones, and Smith*; Justice Smith not

 participating]

Reversed and Remanded

Filed: February 6, 1991

[Publish]





















* Before Earl W. Smith, Justice (retired), Third Court of Appeals, 
 sitting by assignment. See Tex. Gov't Code Ann. § 74.003 (1988).
1. Weldon J. Carlisle; Gilmer T. Woods; Phyllis T. Rothgeb,
individually and as Administratrix of the Estate of John R.
Rothgeb, deceased; and Nadia Leanora Dyer, individually and as
Administratrix of the Estate of Gerald Wayne Dyer, deceased. For
clarity, these parties, appellants in this Court, will be
referred to herein as "plaintiffs."
2. Philip Morris, Inc.; R. J. Reynolds Tobacco Company; The
American Tobacco Company; Liggett & Myers, Inc.; Liggett & Myers
Tobacco Company; Liggett Group, Inc.; The Tobacco Institute,
Inc.; The Council for Tobacco Research - U.S.A., Inc.; and H. E.
Butt Grocery Company. For clarity, these parties, appellees in
this Court, will be referred to herein as "defendants."
3. Future litigants in this Court should take heed, however. 
We will not hesitate, on motion or sua sponte, to require
rebriefing for a flagrant rule violation. Tex. R. App. P. 74(p).
4. The original warning was "Caution: Cigarette Smoking May
Be Hazardous to Your Health." Pub. L. No. 89-92, §4, 79 Stat.
283 (1965). In 1970 that warning was strengthened to read
"Warning: The Surgeon General Has Determined That Cigarette
Smoking Is Dangerous to Your Health." Pub. L. No. 91-222, § 2,
84 Stat. 88 (1970). In 1984, Congress again revised the warning
to require, on a rotational basis, the following:

 SURGEON GENERAL'S WARNING: Smoking Causes Lung Cancer, 
 Heart Disease, Emphysema, And May Complicate Pregnancy.

 SURGEON GENERAL'S WARNING: Quitting Smoking Now Greatly 
 Reduces Serious Risks to Your Health.

 SURGEON GENERAL'S WARNING: Smoking By Pregnant Women
May Result in Fetal Injury, Premature Birth, And Low Birth
Weight.

 SURGEON GENERAL'S WARNING: Cigarette Smoke Contains 
 Carbon Monoxide.

15 U.S.C. § 1333.
5. See also the letter, dated April 7, 1965, from Robert E.
Giles, General Counsel of the Department of Commerce, to
Congressman Oren Harris, Chairman of the House Committee on
Interstate and Foreign Commerce:


 One basic objective of each of these bills is
the same -- to protect the health of consumers and
prospective consumers of cigarettes. H.R. 3014 and
H.R. 4007 have the additional stated objective of
protecting commerce and the national economy. While we
would ordinarily strongly support both objectives, we
feel that . . . the proposed means of attaining the
latter objective may be incompatible with the health
protection objective. Under such circumstances we
believe that the public health interest must prevail.


1965 U.S. Code Cong. & Admin. News 2350, 2361.
6. "The Surgeon General now classifies cigarette smoking as
physiologically addictive, as do the National Institute of Drug
Abuse and the American Psychiatric Association." Comment, supra,
30 B.C.L. Rev. at 1128 n.179.
7. "[M]edical research has determined that nicotine, which
is present in tobacco and cigarette smoke, is an addictive drug
that causes the smoker's inability to quit smoking despite his or
her awareness of its health risks." Comment, supra, 30 B.C.L.
Rev. at 1128 n. 179.
8. See Comment, supra, 30 B.C.L. Rev. at 1128-31; cf.
Crocker v. Winthrop Laboratories, Div. of Sterling Drug, Inc.,
514 S.W.2d 429 (Tex. 1974). A 1981 Federal Trade Commission
report showed that, while 90% of the American public is aware
that cigarettes are hazardous to health, over half of American
adults do not know that cigarette smoking is addictive. See
Comment, supra, 20 Loy. L.A.L. Rev. at 914 (1987). 
9. We conclude that the Labeling Act requires only minimum
conduct on the part of cigarette manufacturers. The
congressional goal appears to have been uniform labeling
regulations, not uniform labels. Thus, manufacturers are not
prevented from voluntarily placing stronger warnings on cigarette
packages and advertisements. Cf. Ferebee v. Chevron Chemical
Co., 736 F.2d 1529, 1543 (D.C. Cir.), cert. denied, 469 U.S.
1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984); Banzhaf v. Federal
Communications Comm'n, 405 F.2d 1082 (D.C. Cir. 1968). "Banzhaf
supports the argument that Congress did not seek to preempt the
flow of information to the public, but only the affirmative
requirement of additional labeling. Nothing short of that is
inconsistent, incompatible, or an obstacle to Congress' purpose
in legislating the Act." Comment, supra, 20 Loy. L.A.L. Rev. at
908.
10. There are, in addition, more explicit indications that
the trial court in the present case did not consider the
defendants' substantive-law ground. The record indicates, albeit
incompletely, that the trial court initially granted a
continuance of the summary judgment hearing in order to allow the
plaintiffs more time for discovery. Subsequently, the defendants
filed a "motion for reconsideration" and convinced the court that
the preemption issue did not require additional discovery. The
trial court then agreed to hear that part of the defendants'
motions that requested summary judgment on preemption grounds. 
All defendants except R.J. Reynolds concede this point in their
brief: "[T]he issue whether cigarettes can be found defective or
unreasonably dangerous under Texas state law is not before this
Court."
11. If our earlier preemption discussion has seemed to imply
that the plaintiffs would, in the absence of preemption, have
viable causes of action, such expressions represent merely an
assumption made only for purposes of our preemption decision.
Nothing herein should be taken as an expression of opinion as to
the merits of the plaintiffs' claims.